[No. 11841.  Department Two.  July 30, 1914.]

A. E. COLBURN, *Respondent*, v. WASHINGTON STATE ART
ASSOCIATION, *Appellant*.[1]

BAILMENT—LOSS OF GOODS—LIABILITY OF BAILEE.  Where goods
are placed on exhibition in defendant's museum at defendant's re-
quest, and the evidence fails to show that they were placed there
under a contract amounting to a warranty for their return, the
transaction is a bailment for the mutual benefit of both parties,
hence the defendant is bound to exercise ordinary diligence only,
and is liable accordingly in the event of loss or damage to the goods.

SAME—NEGLIGENCE—EVIDENCE—SUFFICIENCY.  In such case, the
evidence is insufficient to show negligence of the bailee in guarding
against loss of the goods by theft, where the articles exhibited were
placed in the museum for the mutual benefit of the parties, the
plaintiff himself directing and assisting in arranging the exhibit,
and, upon objecting to the manner of securing the show case in
which the articles were placed, finally consented to the use of wire
fastenings instead of a padlock, being told that the method employed
was equally as safe and that a watchman was employed, and it was
further shown that the plaintiff visited the museum and saw his
goods several times prior to the theft, and that he was free to re-
move them at any time he desired.

BAILMENT—LOSS OF GOODS—NEGLIGENCE—BURDEN OF PROOF.  In an
action to recover for loss of articles placed in defendant's care for
exhibition purposes, there is a presumption of negligence from their
loss, but where the bailee shows the loss to have resulted by theft of

[1]Reported in 141 Pac. 1153.

third parties, he thereby meets the *prima facie* case against him for failure or refusal to deliver the articles, and the burden of proof as to his negligence then rests upon the plaintiff.

SAME—NEGLIGENCE—ASSUMPTION OF RISK. The plaintiff cannot recover from a bailee for the loss of goods by theft, on the ground that permission was denied him to put a padlock on the case in which the goods were kept, where it was shown that he voluntarily placed and left them there for exhibition, and knew the manner in which the case was fastened, thereby assuming the risk in that respect.

Appeal from a judgment of the superior court for King county, Mackintosh, J., entered October 18, 1913, upon findings in favor of the plaintiff, in an action on implied contract, tried to the court. Reversed.

*Claude E. Stevens* (*Roney & Loveless,* of counsel), for appellant.

*Elias A. Wright* and *Sam A. Wright,* for respondent.

PARKER, J.—The plaintiff seeks recovery of damages resulting from the loss of certain of his goods by theft while they were on exhibition in the defendant's museum among curios and works of art belonging to it and others. The plaintiff's claim seems to be principally rested upon the theory that his goods were in the possession of the defendant as a mere loan for its sole benefit under an agreement by it to return them, amounting to a guaranty to make such return, and that, in any event, the defendant's negligence was the cause of the loss of the goods, rendering it liable for their value if it be held that they were there on exhibition under an agreement amounting to one of bailment for the mutual benefit of both plaintiff and defendant. A trial before the court without a jury resulted in findings and judgment against the defendant for the sum of $188, the value of so much of the goods as were stolen and not recovered. From this judgment, the defendant has appealed.

Appellant is a corporation, and maintains, in Seattle, a museum for the exhibition of curios, works of art, etc. It is

not a corporation maintaining a business for profit in a commercial sense. It is maintained by donations, membership fees, and admissions charged to others than its members. While it has curios and works of art of its own on exhibition, many of its exhibits belong to others and are placed in its museum either as a mere loan, or in pursuance of agreements with owners mutually beneficial to it and such owners.

Respondent is a lapidary and manufacturer of jewelry, maintaining a place of business in Seattle. In February, 1912, a Mr. Charbeneau, one of the curators of appellant, visited respondent at his place of business, and invited him to put some of his goods on exhibition in the rooms of appellant. Respondent's own version of this visit and the placing of his goods on exhibition is as follows:

"He came in there one afternoon and called on me and said that they were going to open up the museum in a day or two, and he said that they wanted to make the best showing possible down there and he would like to have me put an exhibit down there. He said that they had a showcase that they did not have anything to put in and that they would like to have me put some good stones in it and make an exhibit something like I had at the A. Y. P. Fair and the Chamber of Commerce. I told him I did not have much time to make an exhibit in two or three days, and that I would have to take my stock if I did it. He said that they wanted to make a good showing, and he said if I would bring down some stuff they would give me the showcase and see that the goods were well taken care of, and that he would be glad to have me make an exhibit. I told him that I did not have the time, and he insisted on doing it. I said, 'What would there be in it, suppose I did?' He said, 'We can do a lot of advertising for you. You can have cards and put a sign on the place. It is something unusual. We don't usually permit that, and you can make a good many customers that way.' 'Bring the stuff and make a showing.' I took Mr. Lempke and introduced him to Mr. Charbeneau. Mr. Lempke was cutting cameos at my place at the same time, and Lempke liked that and he wanted me to make an exhibt of cameos at the time I had the exhibit; and he wanted us to make an exhibit together; and either that day or the next I went to Mr. Berg,

(appellant's agent in charge of exhibits) and asked him to show me the case that he had, and Mr. Berg took me down and showed me the case. I told him that it was necessary to have the best light possible. He said that that was the best location that he had in the room, and that he would give it to me for that occasion; and we got up the stuff and took it down there and made the exhibit. I took the boys down there to help me out in the afternoon. The case hadn't been dressed, or anything. I took Albert Wilson and Lempke. They went down with me. We went to work and decorated the goods, and Albert Wilson arranged the stuff, and there wasn't any way to lock up the case that I could see. I asked Mr. Berg if I could put a padlock on the cases. He said the cases were all locked with wire at the bottoms that places the two backs of the cases together and put wires around the legs, twisted around, and he said the show cases were borrowed and he would rather not mar them up in any way. He said they were perfectly secure that way, wired, and that there was a watchman there all the time, and there would be no danger. . . . I asked him, when they went down there, 'What is in it?' and he says, 'You can put your cards down there. It is positively against our rules, but if you make a good exhibit I will let you put your cards there' . . . I put a box of them on the counter. . . . I went down there and asked Mr. Berg to show me the case we were to put the exhibit in and he took me down and showed it to me, and I told him that one of the main things was to have a good light, to show up the stones . . . He told me I could take it where I liked best."

The case in which the respondent's goods were placed, as well as those of others, had doors at the back as the only means of entrance. This case and another similar one were placed back to back so the doors could not be opened nor the cases entered without separating them. The legs of the cases were then securely wired together. Respondent testified, touching this matter, as follows:

"That was Mr. Berg's way of fastening all the cases, and he got us the wire and pliers and put it together that way. I wanted to put a padlock on, and I took a lock up there to put on. I have got it in my pocket, and Mr. Berg didn't

want the cases marred; he would not let me. I told him it wasn't a very secure way of fastening. He said there was a watchman there and it was perfectly safe."

Other evidence, we think, shows that this method of securing the respondent's case against entrance was as effectual as the locking of it by a padlock in the manner suggested by appellant would have been, and made it fully as difficult of entry by one evilly disposed. In any event, it is apparent that respondent knew at the time that the case containing his goods was to be, and was in fact, so secured. Respondent's exhibit consisted of articles of moderate value, no one of which exceeded $6 in value, as indicated by his complaint, being rings, brooches and tie pins containing stone sets, and also some cut stones separately. It seems to have been the principal purpose of the exhibit to show Washington state gems and their adaptive use in the manufacture of jewelry. No list of the articles placed there by respondent was furnished to appellant, nor was any receipt given by appellant to respondent therefor. On this subject, respondent testified as follows:

"Q. When you placed that exhibit down there did you give Mr. Berg a list of the articles in there? A. He never asked for any. Q. Did you give him one? A. No, sir. Q. Did he ever give you a receipt for anything you placed in there? A. No. He gave me a guaranty that the stuff would be safe."

Thereafter, respondent visited the museum and saw his goods several times prior to the theft. His goods were placed there without any agreement as to their remaining any particular time. It is plain from the evidence that he was free to remove them at any time he desired. On August 4, 1912, about six months after placing the goods on exhibition, some $200 worth of them were stolen from the case in which they were exhibited. This was accomplished by the removal of the wire fastenings on the legs of the cases, and pushing them apart at one end so the doors could be opened. Arthur E.

Hall, who was in charge of the museum for appellant on that day, testified as to what then occurred as follows:

"On this particular afternoon, I kept watch over the museum as much as possible. . . . I noticed two young fellows coming out of the front gallery. They looked suspicious, and I followed them out on the street. I saw them go up the street, those I was watching, and I went back downstairs and when I got back downstairs I saw that something was wrong with the cases. I looked up and I could see at a glance that articles were gone. I did not know how many were gone. I came back upstairs and informed the stenographer that was there that I was going down the street to try to follow those boys. I was unsuccessful, and I brought a policeman back with me,—I believe Mr. Platt was there at the time, and I explained it to him, and the police said the best thing to do is to go down and see Mr. Tennant, I believe, the head of the detectives."

This, apparently, is all the information that appellant's officers or servants had as to the removal of respondent's goods by theft prior to their actual taking. It is also substantially all of the information the record furnishes us as to the degree of care or want of care exercised by appellant over respondent's goods until the time they were actually stolen. There is considerable evidence in the record concerning the efforts of appellant and the police looking to the recovery of respondent's goods after they were stolen, but we see nothing in this evidence that points to negligence on the part of appellant. Some complaint is made that appellant did not inform respondent of the fact that his goods had been stolen as promptly as it should, but the evidence also indicates that, even after he was so informed, he did not lend that assistance towards their recovery or bringing the thief to justice that he should. Among other things, he neglected to go to the officers who had recovered some of the goods and identify them, though he was informed that some of the goods were in the officers' possession. However, as to these facts occurring after the goods were actually stolen, we think they

are of too slight consequence touching the question of the appellant's negligence to be seriously considered here.

We think the foregoing is as favorable a statement of the controlling facts touching appellant's liability as can be made from the evidence before us. It is substantially, as we have noticed, respondent's own version of the affair, except as to Hall's statement of what occurred at the time of the theft. This version of respondent is contradicted in several particulars by the testimony of officers of appellant, especially as to the degree of care and responsibility which appellant agreed to exercise and assume as to respondent's property; but, since we are constrained to dispose of the cause in appellant's favor upon the facts as above summarized, we take no account of this conflict in the evidence.

Were the goods placed upon exhibition under a contract amounting to a warranty for their return on the part of appellant, as claimed by respondent? We think not. It is true that respondent testified, after stating the manner of placing the goods on exhibition, and conversation occurring between him and appellant's servant, that "he gave me a guaranty that the stuff would be safe." It is manifest, however, that this is only respondent's own conclusion from what then occurred. He gives no conversation or statement on the part of any of appellant's servants evidencing, as we view it, in any degree, any such a contract. It seems quite clear to us from the facts we have narrated that this was nothing more than a bailment for the mutual benefit of both appellant and respondent. This being the nature of the relation between them then created, it seems plain, under well settled rules of law, that appellant was bound to exercise ordinary diligence only, and would become liable accordingly in the event of loss or damage to respondent's goods. Van Zile, Bailments (2d ed.), §§ 34 and 35; Hale, Bailments, p. 24; *Firemen's Fund Ins. Co. v. Schreiber,* 150 Wis. 42, 135 N. W. 507, Ann. Cas. 1913 E. 823, 45 L. R. A. (N. S.) 314. We conclude that appellant's duty required of it only ordinary diligence. The trial court

evidently, as appears from its findings, entertained this view, but disposed of the cause in favor of respondent upon the theory that appellant's want of ordinary diligence was the proximate cause of the loss of respondent's goods by theft.

Is appellant liable by reason of its negligence? We are constrained to hold that it is not, in view of the facts and circumstances we have above summarized, being, in substance, respondent's own version of the facts; and that appellant did exercise such reasonable care as was required by it under the law. Counsel for respondent invoke the general rule that, in an action to recover damages against a bailee for goods placed in his possession, which goods are not accounted for in any manner and not returned to the bailor upon demand, the burden of proof, as against his presumed negligence, then rests upon the bailee. This rule was recognized by this court in *Pregent v. Mills*, 51 Wash. 187, 98 Pac. 328, but it is not without its limitations in cases of loss by burglary, larceny, fire, and other causes which, of themselves, do not point to negligence on the part of the bailee. In other words, when the bailee has shown loss from some such cause, he has met the *prima facie* case of negligence made against him by his failure to return the goods, and the burden of proof as to his negligence then rests upon the plaintiff as in any other case of alleged negligence. In *Claflin v. Meyer*, 75 N. Y. 260, 31 Am. Rep. 467, Judge Hand, speaking for the court, touching the liability of a bailee for loss of goods by a burglary, said:

"The cases agree that where a bailee of goods, although liable to their owner for their loss only in case of negligence, fails, nevertheless, upon their being demanded, to deliver them or account for such non-delivery, or, to use the language of Sutherland, J., in *Schmidt v. Blood*, where 'there is a total default in delivering or accounting for the goods,' (9 Wend. 268) this is to be treated as *prima facie* evidence of negligence. (*Fairfax v. N. Y. C. and H. R. R. Co.*, 67 N. Y. 11; *Steers v. Liverpool Steamship Co.*, 57 id. 1; *Burnell v. N. Y. C. R. R. Co.*, 45 id. 184.) This rule proceeds either from the assumed necessity of the case, it being presumed that the

bailee has exclusive knowledge of the facts and that he is able to give the reason for his non-delivery, if any exist, other than his own act or fault, or from a presumption that he actually retains the goods and by his refusal converts them.

"But where the refusal to deliver is explained by the fact appearing that the goods have been lost, either destroyed by fire or stolen by thieves, and the bailee is therefore unable to deliver them, there is no *prima facie* evidence of his want of care, and the court will not assume in the absence of proof on the point that such fire or theft was the result of his negligence. (*Lamb v. Camden and Amboy R. R. Co.*, 46 N. Y. 271, and cases there cited; *Schmidt v. Blood*, 9 Wend. 268; *Platt v. Hibbard*, 7 Cow. 500. . . .

"It will be seen, as the result of these authorities, that the burden is ordinarily upon the plaintiff alleging negligence to prove it against a warehouseman who accounts for his failure to deliver by showing a destruction or loss from fire or theft. It is not of course intended to hold that a warehouseman, refusing to deliver goods, can impose any necessity of proof upon the owner by merely alleging as an excuse that they have been stolen or burned. These facts must appear or be proved with reasonable certainty. Nor do we concur in the view that there is in these cases any real '*shifting*' of the burden of proof. The warehouseman in the absence of bad faith is only liable for negligence. The plaintiff must in *all cases*, suing him for the loss of goods, allege negligence and prove negligence. This burden is never shifted from him. If he proves the demand upon the warehouseman and his refusal to deliver, these facts unexplained are treated by the courts as *prima facie* evidence of negligence; but if, either in the course of his proof or that of the defendant, it appears that the goods have been lost by theft, the evidence must show that the loss arose from the negligence of the warehouseman."

The New York courts have adhered to these views in the later cases of *Stewart v. Stone*, 127 N. Y. 500, 28 N. E. 595, 14 L. R. A. 215; and *Campbell v. Klein*, 101 N. Y. Supp. 577. In *Knights v. Piella*, 111 Mich. 9, 69 N. W. 92, 66 Am. St. 375, it is said:

"Upon this record, the defendant has established the fact and circumstances of the theft, without contradiction. There is no presumption of negligence from the mere fact of the

loss or theft, and while there is much reason for the rule, adhered to in many states, that the defendant has the burden of proving the fact of loss, it does not necessarily follow that a presumption of negligence arises; and, if the facts shown in connection therewith do not fail to excuse, the *onus* is on the plaintiffs to shake defendant's exculpation. This does not deny the proposition that when the bailment is proved, and a refusal to deliver is established, the plaintiff has made out a *prima facie* case, and the inference of wrong by the defendant follows, or that it is then for the defendant to explain the loss and exonerate himself, which he may do by showing circumstances which *prima facie* excuse the failure to deliver. To this extent, and in this sense, a burden rests upon the defendant; but, if this question of fact becomes a disputed one, the evidence of the plaintiff must preponderate."

See, also, *Carlyon v. Fitzhenry*, 2 Ariz. 266, 15 Pac. 273; *Sanford v. Kimball*, 106 Me. 355, 76 Atl. 890, 138 Am. St. 345; Van Zile, Bailments (2d ed.), § 34, and note; 5 Cyc. 217. In Schouler's Bailments (3d ed.), § 23, the learned author reviews this subject at some length, concluding his observations as follows:

"All bailees, with or without a special contract, are *prima facie* excused, when they show loss or injury by act of God or of public enemies; and ordinary bailees in a variety of lesser instances, such as fire, loss by mobs, or robbery. Common carriers and innkeepers, as we shall see hereafter, have to bear, apart from special contracts and our later legislation, a variety of risks such as would in no sense impute to them positive negligence or misconduct."

Having in mind these rules touching the burden of proof, and the fact that we have practically no evidence save that of witness Hall above quoted showing the amount of diligence or want of diligence exercised by appellant in caring for respondent's goods, and the conceded fact that they were lost by theft, it seems to us that there is such want of affirmative showing of negligence on the part of appellant that it must be held free from liability such as is here sought to be charged against it.

So far as respondent's being prevented by appellant from putting a lock upon the case is concerned, we think, in view of the fact that he voluntarily placed and left, in the case, his goods, knowing the manner the case was fastened in lieu of a lock, he assumed the risk in so far as the mere manner of fastening the doors of the case is concerned. He manifestly consented to this manner of fastening the doors; and besides, as we have said, the evidence indicates that it, in any event, was as secure a manner of fastening the case as that proposed by respondent would have been. It was also the usual manner of fastening such cases, which respondent knew.

Our attention is called by counsel for respondent to *Vigo Agricultural Soc. v. Brumfiel*, 102 Ind. 146, 1 N. E. 382, 52 Am. Rep. 657, involving the loan of a gun for exhibition, which was placed in a building without any guard or police protection at all in or about the building, the society expressly agreeing that it "will keep an efficient police force on the grounds day and night to take care of articles on exhibition." It affirmatively appeared from the evidence in that case that no policemen or watchmen whatever were kept in or about the building, and it was treated as though nothing of value were stored therein. Upon this theory, apparently, the society was held liable for the loss of the gun. Manifestly, it neglected to do the very thing it expressly promised to do, and thus incurred liability as for negligence. In the case before us, there is no evidence worthy of serious consideration affirmatively showing that appellant did not do all it promised to do, and the loss being concededly by theft, the burden of showing appellant's negligence was upon the respondent. The case last noticed comes as near lending support to respondent's contention as any which counsel have called to our attention. We conclude that the judgment of the trial court must be reversed and the cause dismissed.

It is so ordered.

CROW, C. J., MOUNT, FULLERTON, and MORRIS, JJ., concur.