Argued March 4, reversed and remanded April 13, rehearing denied July 27, 1920.

## HANSEN *v*. OREGON-WASH. R. & N. CO.*

(188 Pac. 963; 191 Pac. 655.)

**Damages—Amount not Determined Solely to Afford Injured Person Compensation.**

1. While the fundamental rule of the law in a damage case is to award compensation, yet rules for ascertaining the amount are formed with reference to the just rights of both parties, and the standard fixed for estimating damages ought to be determined, not

*On burden of proof as to negligence where property is destroyed while in the possession of a carrier holding as a warehouseman, see note in 22 L. R. A. (N. S.) 975.

On presumption and burden of proof as to care or negligence in respect to subject of bailment, see note in 43 L. R. A. (N. S.) 1168.                                                    REPORTER.

only by what might be right for an injured person to receive in order to afford just compensation, but also what is just to compel the other party to pay.

**Damages—Difference Between Value Before and After Injury to Personal Property Proper Measure.**

2. The measure of damages for injury to personal property is generally the difference between its value at the place immediately before and immediately after the injury.

**Warehousemen—Measure of Damages for Injury to Goods Stored Stated.**

3. When goods such as provisions and other perishable articles are placed with a warehouseman and are injured, the measure of damages usually adopted is the difference between the market value of the goods in their damaged condition, at the place where injured and at the time when returned to the owner, and the market value at the time and place of like property in good condition.

**Warehousemen—Damages Due Seller of Injured Goods Stored Pending Delivery not Measured by Contract Price.**

4. Where a seller of packed salmon stored the same with a warehouseman pending notice of the purchaser to ship, and the goods became damaged through the negligence of the warehouseman, and when shipped were refused by the purchaser, the seller, in an action for damages, was entitled to the difference between the market value of the goods in their damaged condition and the market value of like property in good condition, and the warehouseman was not entitled to have the damage measured by the difference between the price fixed in the contract of sale and the price actually received by the seller from third parties.

**Warehousemen—Cause of Injury to Salmon-tins for Jury.**

5. In an action by a storer of goods against a warehouseman for damages by reason of packed salmon-tins becoming rusty, whether the damage resulted from a leak in the roof or from sweating of the cans *held* for the jury.

**Warehousemen—Proof of Leak After Damage Done to Stored Goods Admissible as Tending to Show Prior Leak.**

6. Where goods stored in a warehouse were damaged by water prior to June 26th, it was competent for the storer of the goods to testify that he found the roof leaking shortly after such date.

**Evidence—"Burden of Proof" Defined.**

7. The phrase "burden of proof" has two meanings, one to express the idea that a named litigant must in the end establish a given proposition in order to succeed; the other, to express the idea that at a given stage in the trial it becomes the duty of a certain one of the parties to go forward with the evidence.

**Trial—Held Inaccurate to Say Burden of Proof Shifted During Trial.**

8. When the words "burden of proof" are used to express the idea that a named litigant must establish a given proposition, then

it is not accurate to say that the "burden of proof" shifts at any stage of the trial.

### Warehousemen—Burden on Storer of Goods to Show Negligence.

9. A storer of goods with a warehouseman, in an action for damages for negligent injury by water to the goods, has the burden throughout the trial of showing negligence, although proof or delivery of goods to the warehouseman in good condition and injury to the goods while in the exclusive possession of the warehouseman is *prima facie* evidence of negligence on the part of the warehouseman, in view of Sections 726, 810, 868, subdivision 5, L. O. L.

### Bailment—Damage to Goods in Hands of Bailee Raises Presumption of Negligence.

10. Upon proof of delivery of chattels to the exclusive possession of a bailee in good condition and proof of return in bad condition, or proof of failure to return, the law raises a presumption that the injury or failure to return was caused by the negligence of the bailee, and such proof, plus the presumption, which because of the necessity the law arbitrarily raises, makes a *prima facie* case, which requires the bailee to go forward with evidence; but bailor may by his own pleadings or evidence ascribe the injury or loss to a cause, and thus relieve the bailee from the presumption of negligence.

### Warehousemen—Salmon in Exclusive Possession of Warehouseman, Although Samples were Taken at Times by Storer.

11. Relative to exception to rule that return of goods in bad condition raises presumption of negligence stored salmon was in the exclusive possession of a warehouseman, although the storer took samples and saw the cases occasionally when near the storehouse.

### Warehousemen—Doctrine of Prima Facie Negligence Arising from Injury to Goods not Applicable to Goods Which Deteriorate.

12. The doctrine that where goods are stored with a warehouseman in good condition and are returned in bad condition the warehouseman is presumed *prima facie* negligent does not apply, unless the goods are of such a nature that they would not deteriorate or perish from internal defects or through the operation of natural causes, and were in the exclusive possession of the warehouseman.

### Warehousemen—Whether Rusting of Salmon-tins in Storage Raised Presumption of Negligence Held for Jury.

13. In an action by storer of packed salmon for damages, in that the salmon-tins rusted while in defendant's warehouse, where plaintiff's witnesses testified that the cans could not sweat and become rusty, packed as they were, and defendant's witnesses testified that they could sweat and become rusty, the question of whether the doctrine of *prima facie* negligence applied depended upon the contested fact, and the court could not, as a matter of law, hold that the doctrine did not apply.

**Pleading—Amendment Adding Specification of Negligence Did not Change Cause of Action.**

14. A cause of action in a complaint against a warehouseman for damage to goods alleged to have been caused by a leak in a roof was not changed by an amendment which added a specification of negligence to the effect that defendant permitted and caused the goods in some manner unknown to plaintiff to become saturated with water.

**Warehousemen—Practice Followed to Discover Leaks Admissible, Where Question was Whether There was a Leak Which Damaged Goods.**

15. In an action against a warehouseman for damage to packed salmon, alleged to have been caused by a leak in the roof, court erred in not permitting defendant to show that it was its practice to repair leaks immediately upon their discovery, and that hourly inspections were made; issue being whether or not there was in fact a leak.

**Evidence—Admissions of Agents Admissible.**

16. Admissions of an agent are admissible in evidence, where the agent is authorized to make an admission, as, for example, an attorney in the course of a trial, and where the admission is in the form of a declaration made by the agent while acting within the scope of his agency and about the business of his principal concerning the business in question, but the declaration is not admissible if it relates to a past transaction, unless the agent is empowered to make it.

**Evidence—Admissions of Agent When Admissible Against Principal.**

17. In an action against a warehouse corporation for damages to goods alleged to have been caused by a leak in the roof, a declaration of defendant's foreman, when notified by the storer of the goods of a leak, that he had told his principal about it was admissible in evidence; but other statements made at the same time to the effect that other storers of goods had also complained of leaks in the roof, were inadmissible, being merely narratives of past events.

## PETITION FOR REHEARING.

**Bailment—Presumption of Damages to Goods in Hands of Bailee "Overcome," Where Prima Facie Case is Counterbalanced.**

18. Where bailor, suing for damages to goods in hands of bailee, establishes *prima facie* case of negligence by proof of delivery in good condition and return in bad condition, the bailee is not required to produce evidence overbalancing or outweighing such *prima facie* case, under Section 797, L. O. L., providing that a presumption may be "overcome" by other evidence, but is required merely to produce such proof as will counterbalance the presumption, since bailor has the burden of proving negligence by a pre-

ponderance of the evidence, and since the presumption is merely evidence, and is "overcome" within the statute, when bailee's evidence counterbalances that of the bailor, in view of Sections 695, 793, 795, and Section 868, subdivision 2.

**Warehousemen—Repairs of Leaks, not Limited to Period of Bailment, Inadmissible.**

19. In action against warehousemen for damage to goods from water, testimony as to practice of repairing leaks on discovery thereof, not limited to period covered by the bailment, would have been incompetent.

From Clatsop: JAMES A. EAKIN, Judge.

Department 1.

This is an action to recover damages on account of some cans containing salmon becoming rusty while in defendant's warehouse in Astoria, Oregon.

David Hansen and his wife, Mary Hansen, and his two daughters, Ivy and Lena, are partners doing business as D. Hansen Packing Company. The defendant, Oregon-Washington Railroad & Navigation Company, is a corporation. The partnership operated a salmon cannery at Point Ellis, a place on the Washington side of the Columbia River and across the stream from Astoria. The defendant owned and maintained a dock and warehouse at Astoria. This warehouse is a wooden structure built upon piling, and it stands over the water. It is about 60 feet in width and is 960 feet long.

During the fishing season of 1915 the partnership canned 9,339 cases of salmon. The fish was put up in hermetically sealed cans of two sizes, pounds and half pounds. A case consists of 48 cans, whether pounds or one-half pounds, packed in a box. The partnership used cans of the kind generally used by canneries on the river, and packed the cans in boxes made of kiln-dried spruce lumber, the kind usually employed for that purpose. After putting up the salmon in cans, the partnership packed the cans in

boxes without first lacquering the cans or wrapping them with tissue-paper, and then transported the 9,339 cases in boats across the river and delivered them to the defendant at its warehouse there to be stored.

These 9,339 cases were not delivered at one time, but they were delivered in 18 separate lots, ranging from 31 cases, the smallest, to 904, the largest lot, from time to time during the period beginning with May 27, and ending with December 7, 1915, although the larger portion was delivered during the months of June and July. For each of the 18 lots received by the defendant it issued a warehouse receipt showing the number of cases received. These 18 lots were piled in the northeast corner of the warehouse, but each lot or "load that came in on the boats" was piled "in a little section by itself," with "alleyways" between the sections. Some of the salmon was withdrawn by the partnership from the warehouse prior to December 2, 1915. As already stated, when the cans were packed in the boxes at the partnership's cannery at Point Ellis, they were neither lacquered nor wrapped with tissue-paper. On December 2, 1915, the partnership began the work of wrapping with tissue-paper all the cans stored in the warehouse. This work was not completed until December 30th. In order to do the work, it was necessary to remove the cans from the boxes, wrap them in tissue-paper and then repack them in the boxes. After tissue-papering the cans and replacing them in the boxes, the plaintiffs did not repile them in 18 sections as they were when the work of papering began, but, in the language of one witness, "There was a few small piles around, but they piled them mostly together when they * * tissued them over," or, as tes-

tified by another witness, "They put it very much in one big pile. I think it was all in one big pile." The evidence is not very definite as to the height of this pile, although it does appear from the testimony of at least two witnesses that a person could not stand on the floor and count the cases. The pile was from 20 to 40 feet in width and about 80 feet in length.

In March, 1916, David Hansen went to the warehouse and got some samples to send to a buyer. He opened at least four and possibly six cases, and "took out some cans and found them rusty all the way through." Some of them were rusted "pretty bad," and "others was not as bad"; they were spotted all over, "sides, bottom and top." He said that he looked into the boxes and while he could not see any water, nevertheless, "they looked so they were damp and so was the paper"; and he also testified, "It showed streaks on the floor were the boxes being piled that water got down there somewhere, whether it was sweat or rain, or something." Lena Hansen corroborated her father, and said that she went to the warehouse about March, 1916, to get some samples to send to buyers, and she found the boxes "damp" and "wet," and the cans were rusted "on top," and "where the water had run down the sides."

In addition to the withdrawals already mentioned, the plaintiffs withdrew salmon from time to time until June 26, 1916, and on that date the partnership began the work of reconditioning the salmon which remained in storage. This work of reconditioning, which was begun on June 26, and completed on July 29, 1916, was made necessary by the rust which was found to be on all the cans. The tins were removed from the boxes, sandpapered, lacquered, rewrapped with tissue-paper and then repacked in boxes. The plaintiffs brought this action on the

theory that the defendant negligently permitted water to come in contact with the salmon while in the warehouse, and demanded a judgment against the defendant for $709.30, the cost of reconditioning the salmon which was in the warehouse on June 26, 1916, and for the further sum of $3,539.40 as general damages.

The defendant denied the charge of negligence, and asserted that the rust was caused by sweat brought about by atmospheric conditions over which it had no control, and for which it was not liable. The answer also avers that the warehouse receipts had been negotiated by the plaintiffs to the Astoria National Bank, and that because of that fact the plaintiffs were not the owners of the salmon during the time it remained in storage with the defendant.

A trial resulted in a verdict and judgment for the plaintiffs, and the defendant appealed.

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. C. E. Cochran, Mr. A. C. Spencer* and *Mr. W. A. Robbins,* with an oral argument by *Mr. Cochran.*

For respondents there was a brief over the names of *Messrs. G. C. & A. C. Fulton* and *Mr. Edw. C. Judd,* with an oral argument by *Mr. G. C. Fulton.*

HARRIS, J.—In the complaint it is alleged that the salmon was "damaged and rendered less valuable to the extent of" $3,539.40 on account of the rust, which, the plaintiffs aver, was caused by the negligence of the defendant. David Hansen was the first witness called in behalf of plaintiffs, and, among other things, he testified on direct examination that he knew the market value of salmon in good condi-

tion in Astoria in March, 1916, and that it was $1.25 per dozen for half pounds and $1.90 per dozen for pound cans. This witness gave testimony, on his direct examination, to the effect that the reasonable and market value of the plaintiffs' salmon, after having been reconditioned, was $1.15 for the half pound and $1.75 per dozen for the pound cans. The cross-examination developed the fact that the plaintiff had, prior to December, 1915, entered into a written contract with Seaman Brothers of New York, for when asked: "Did you have those cases of salmon sold when you brought them over to Astoria?" he answered thus:

"I had them sold in a way, yes, when they were ready to take them. They were not ready to take them at the time, so I had to leave them there until they called for them when they wanted them."

The record does not show with incontrovertible certainty the exact amount called for by the contract with Seaman Brothers, although the evidence might fairly be said to support the inference that the contract covered all the salmon in storage on December 2, 1915, for on redirect examination David Hansen testified that "he had a contract for sale," and that he had sold the salmon to Seaman Brothers to be delivered "upon his request, whenever he wanted them." Again, when asked upon cross-examination why the cans were tissue-papered in December, he explained:

"Because we wanted them ready for shipment. We didn't know—I didn't know what time he would call for them."

Upon redirect examination, after having stated that the plaintiffs "had contracted" to sell the salmon to Seaman Brothers, David Hansen was asked: "What

was your contract price?'' Immediately the at-
torney for the defendant inquired whether the con-
tract was in writing, and, upon answering that it was,
the witness explained that he did not have it with
him, but stated that he would get it; but the writing
was not produced, nor did the defendant renew its
request for the production of the paper. The record
shows that after both the plaintiffs and the defend-
ant had rested, and before the delivery of the charge
to the jury, the court's attention was called to the
written contract with Seaman Brothers, whereupon
the court remarked that ''it was not used as a basis
for damages,'' and the court also added: ''And I
don't see that it could have been.'' The court in-
structed the jury that the plaintiff claimed that the
market value of the salmon in the condition in which
it was when stored was $1.25 per dozen for the half-
pound cans and $1.90 per dozen for the pound cans,
and the court also told the jury that, if after the
work of reconditioning was done the fair and reason-
able value of such salmon was less than it was be-
fore this work was done, ''then you should find how
much less valuable it was, and award such sum to
the plaintiffs.'' The defendant is not, as contended
by plaintiffs, precluded from questioning the meas-
ure of damages adopted by the trial court, since the
instructions to which attention has been directed were
properly excepted to, and the objection was pre-
served by two distinct assignments of error. The
record, therefore, presents a situation where the
measure of damages adopted at the trial was the dif-
ference between the market value before damage and
the market value after damage, notwithstanding the
fact that at the very time the salmon was delivered to
the defendant for storage there was a written contract

for the sale of the salmon to Seaman Brothers, who, after seeing the samples which had been taken from the cases in March and forwarded to New York for inspection, refused to accept the salmon because "they were rusty." We infer from the evidence that when David Hansen stated that Seaman Brothers refused to accept the salmon, he meant that they refused to accept the fish under the terms of the written contract; for it appears that 5,000 cases were sent to Seaman Brothers; and since, as we understand the record, it is conceded that only 2,944 cases had been withdrawn prior to June 26, 1916, leaving 6,395 cases in the warehouse on that date, it necessarily follows that either all or a large part of the 5,000 cases sent to Seaman Brothers came from the 6,395 cases which had been reconditioned on account of being rusty.

1-4. The defendant insists most earnestly that the true measure of damages is the difference between the price fixed in the contract with Seaman Brothers and the price which the plaintiffs actually received, provided they used due diligence in securing as high a price for the salmon after it was reconditioned as a reasonably prudent vendor would have used. In support of this position the defendant cites the following precedents: *Krebs Hop Co.* v. *Livesley,* 59 Or. 574 (114 Pac. 944, 118 Pac. 165, Ann. Cas. 1913C, 758); *Wigan* v. *La Follett,* 84 Or. 488 (165 Pac. 579); *Stillwell* v. *Hill,* 87 Or. 112 (169 Pac. 1174). The authorities relied upon by the defendant are not applicable to the facts presented here, for each of those precedents involved the alleged breach of a contract for the sale of personal property, and the controversy was one between the buyer and the seller. The situation presented here is essentially different, since

the litigation is between, not the buyer and seller, but the seller and a third person. We need not attempt to decide what the rule would be if the defendant had knowledge, when the goods were delivered to it, of the contract between the plaintiffs and Seaman Brothers, because there is neither allegation nor proof that the warehouseman knew about the contract. While the fundamental rule of the law is to award compensation, yet rules for ascertaining the amount of compensation to be awarded are formed with reference to the just rights of both parties, and the standard fixed for estimating damages ought to be determined not only by what might be right for an injured person to receive in order to afford just compensation, but also by what is just to compel the other party to pay: 8 R. C. L. 434. Stated broadly, the measure of damages for an injury to personal property is generally the difference between its value at the place immediately before and immediately after the injury: 17 C. J. 877; 6 C. J. 1165; *Union Stone Co.* v. *Wilmington Transfer Co.*, 5 Boyce (Del.), 59 (90 Atl. 407). When the litigation involves goods such as provisions and other perishable articles received by a warehouseman for safekeeping, the measure of damages usually adopted is the difference between the market value of the goods in their damaged condition in the place where injured, and at the time when returned to the owner, and the market value at the same time and place of like property in good condition. It has been said that the time of the return of the goods to the owner is in legal contemplation the time of the occurrence of the injury: 3 R. C. L. 155; *Western Union Cold Storage Co.* v. *Ermeling*, 73 Ill. App. 394; *Union Stone Co.* v. *Wilmington Transfer Co.*, 5 Boyce (Del.), 59

(90 Atl. 407); *Holt Ice & Cold Storage Co.* v. *Arthur Jordan Co.,* 25 Ind. App. 314 (57 N. E. 575). If the plaintiffs purchased salmon to take the place of the salmon which was injured or destroyed so that they could fulfill their contract with Seaman Brothers, they were presumably compelled to pay the market price for the fish so purchased. The defendant was not entitled, on the record presented here, to have the damage measured by the difference between the price fixed in the contract with Seaman Brothers and the price actually received by the plaintiffs.

The complaint accused the defendant of negligence in the following language:

"That while said canned salmon were stored in defendant's warehouse, the defendant, its agents and servants, carelessly and negligently allowed, *permitted, and caused in some manner unknown to plaintiffs the tissue paper in which said salmon cans were wrapped, as well as the boxes in which they were cased to come in contact with and become saturated with water. That* defendant also carelessly *permitted* the roof of said warehouse, over and above the place where defendant had stored and placed said canned salmon, to become out of repair, and that by reason of said defendant's, its agents' and servants', neglect and lack of care the rain came through the roof of said warehouse over and above the place where defendant had placed said canned salmon, and said canned salmon became wet. *That* by reason of said cans being wet, as aforesaid, they became rusty and out of order."

After the commencement of the trial the complaint was amended by inserting the italicized words, placing a period after the words "salmon became wet," and striking out the word "and," then appearing after the words "became wet," and inserting in lieu of it the italicized word "that." The defendant ob-

jected to the amendment, and it now insists that the ruling of the trial court allowing the amendment constitutes reversible error. The corporation also contends that its motion for a judgment of nonsuit and for a directed verdict should have been allowed. We shall first examine the record to see whether there was sufficient evidence to warrant a submission of the controversy to the jury, and, while making such examination, we shall assume that the amendment was properly allowed.

It will be observed that the complaint contains two specifications of negligence, and that one is couched in general and comprehensive language, while the other is definite, explicit and precise. The plaintiffs say that the defendant permitted, "in some manner unknown to" them, the tissue-paper and the boxes "to come in contact with and become saturated with water," and they then allege in definite and specific language that the defendant permitted the roof to become out of repair so that the rain came through and wet the cans.

Every witness who handled the cans in December, 1915, testified that they were in good condition. Lena Hansen said that the salmon was "in first-class condition"; that there was no rust on the cans, and that "the boxes were perfectly dry." Laura Hansen stated that she found the tins "in very good condition," and that both the cans and the boxes were dry. Violet Ducich declared that the cans "were shiny, like any bright, good-looking cans"; that there was no rust on the cans, and that the boxes were dry. David Hansen testified that he did not see any rust on the cans in December. There was evidence in behalf of the defendant to the effect that the boats in which the cans were brought across the river were

loaded heavily, and that on one occasion the water splashed over the side of the boat on to the cases of salmon. A warehouse receipt, issued on September 22, 1915, shows that 200 cases of salmon were received in the rain, but there is evidence in the record from which the jury could have concluded that those 200 cases were withdrawn from the warehouse prior to June 26, 1916. It is manifest that there was substantial evidence on both sides of the question 'as to whether or not the cans were dry in December, and therefore the determination of that question was properly submitted to the jury.

5. The defendant contends that there was no evidence showing a leak in the roof prior to June 26, 1916, and that there is no evidence showing directly or indirectly that the rust was caused by the negligence of the defendant. The corporation argues that the changes from a cool to a warm temperature will cause unlacquered cans containing salmon to sweat, and that sweat will produce rust; and the defendant therefore takes the position that atmospheric conditions caused the cans, which were unlacquered, to sweat, thus producing rust. The defendant declares that—

"It is conceded by all parties in this case that unwrapped and unlacquered salmon cans will sweat and rust, even when properly stored and cared for."

The plaintiffs argue that the rust was not produced by sweat, and they contend that the defendant permitted water to come in contact with the cans. Attention has already been directed to the testimony of David Hansen and Lena Hansen, concerning the conditions found by them in March, when they took samples from some of the cases. It will be remembered that both witnesses stated that the samples were

rusty. David Hansen said that there were streaks on the floor, and that the paper and boxes were damp. Lena Hansen, who was qualified to speak as an expert, testified that the cans were rusted "where the water had run down the sides," and, speaking in the light of thirteen years of experience, she expressed the opinion that the rust was not caused by sweating; and she also stated that she could "trace the course of the water from the top of the box down to the can." There is considerable evidence in behalf of plaintiffs about the condition of the salmon in June, 1916. The cans were rustier in June than in March. Laura Hansen said that the "boxes were wet" and she saw a "leak in the roof." When reconditioning the cans in June the workers "would go through the pile" and "pile from one side to the other"; and Laura Hansen testified that "we had got them all retissued and cleaned up and we found that the place where they had been piled, it was leaking on them and it was leaking on those we had finished rewrapping." This witness also testified that "the floor around where the boxes were was all wet, so it was quite a big leak." Lena Hansen had marked the letter "R" upon a diagram to indicate "where she saw it rain," and when Lena Hansen was asked to "Mark in there at where you saw the rain drop," she said: "I saw it in the same place." David Hansen testified about seeing "streaks" on the floor; that, when wrapped with tissue-paper and packed in boxes as was done with the plaintiffs' salmon, cans "will keep free from rust for years," and "they never sweat"; and, moreover, he stated that "sweat will not rust them, that is my experience," and he had seen "thousands of cases" wrapped "that way." Referring to the "streaks" on the floor, this witness explained

that the defendant "claimed it was oil, but" he added, "it was no oil about it." Lena Hansen said that cans will not rust "unless there is some water on them somewhere, they will never rust, and especially wrapped in tissue-paper." She stated that she had "seen salmon wrapped in paper" and stored in a building like the warehouse of the defendant, where the conditions were similar, and that the tins were in good condition at the end of three years. At some time subsequent to June 26th, and after about 40 cases had been reconditioned, Lena Hansen saw it leaking from the roof "on the boxes and I put a paper over the leak where it leaked on the boxes." She says that she called the attention of Mr. Canari, the warehouse foreman, to the leak. When asked to indicate "at what part of the pile of cases did the water drop?" She answered: "Dropped right on top of the pile, all over the" 6,000 cases. Frankie Ringsted told about cans similarly packed and similarly stored, and she said that she had seen them kept in that way "from one year to the other," without becoming rusty. Lena Ringsted worked on the salmon in June, and she said that some of the boxes were wet and "we set them out to dry." This witness testified that "sweating does not hurt the cans," and that she had "had enough experience to know that it [sweat] does not rust cans." G. W. Sanborn, who has been in the salmon business for 35 years, expressed the opinion that cans which were papered, packed and stored like those owned by the plaintiffs ought to keep in good condition from "three to four years" without rusting. He also stated that, although "where salmon is frozen, cased and frozen and then thawed out, it will sweat," yet it does not "freeze hard enough to freeze salmon in Astoria,"

and ''if the cans were wrapped and put in dry cases, it won't sweat; where it is left loose in the pile, it will sweat.''  L. C. McCloud, who had handled a great deal of salmon put up in hermetically sealed cans, said that, when in the grocery business, he knew of salmon having been packed and stored like that of the plaintiffs and carried from one season to the other without signs of rust showing on the cans. The testimony of J. T. Ross, a wholesale and retail dealer in groceries and meat in Astoria for over 30 years, was like that of McCloud.  We have then before us a record containing evidence tending to show that the salmon was in good condition when wrapped with tissue-paper in December, 1915; that the cans were rusty in March and still rustier in June; that the paper was damp and the boxes wet in June; that sweat will not produce rust upon cans wrapped, packed, and stored as were those of the plaintiffs; and that rain-water was actually leaking through the roof in June.  Moreover, one witness gave testimony from which the plaintiff could have argued that cans, when papered and packed in kiln-dried spruce boxes, will not sweat.  Manifestly, this is sufficient affirmative evidence to warrant the submission of the controversy to a trial jury: *Leidy* v. *Quaker City Cold Storage and Warehouse Co.,* 180 Pa. St. 323 (36 Atl. 851),

6. The cans became rusty prior to June 26th; and, since the plaintiffs aver that the rust was caused by the negligence of the defendant in permitting water to come in contact with the cans, it follows that the accusation of negligence necessarily involves the assertion that water leaked upon or came in contact with the cans at some time prior to June 26th.  The defendant insists that all the evidence concerning the leak in the roof on or subsequent to June 26th is

incompetent. Having offered evidence tending to show that the cans were rusty, and that, when papered, packed, and stored as these cans were, sweat will not produce rust; and, indeed, having offered some evidence to the effect that such cans will not sweat, it was competent to show the circumstances of the leak in the roof in June, and from that fact the jurors might infer that the roof was in the same condition prior to June: Wigmore on Evidence, § 437. There was no error in admitting the evidence of the leak in June.

The court told the jury that there were three questions to be decided, of which one was whether the cans were injured by coming in contact with water or by water leaking from the roof. The court properly instructed the jury that the burden rested upon the plaintiffs to prove "these facts" by a preponderance of the evidence and that:

"If the evidence is equally balanced, or if the defendant's evidence is more satisfying and convincing than the plaintiffs' as to any of these facts, your verdict must be for the defendant."

In a subsequent portion of the charge the court told the jury:

"The burden of proof is upon the plaintiffs to show that this canned salmon was delivered to the defendant in good condition, that it was injured or damaged whilst stored in defendant's warehouse, that the damage or injury was caused by its coming in contact with water.

"It is not necessary for the plaintiffs to prove that water came through the roof, or that the roof leaked. The plaintiffs will have established a *prima facie* case if they shall have produced evidence showing that the salmon became wet other than through purely atmospheric conditions while stored in defendant's warehouse.

"The rule of law is that, after plaintiffs shall have shown this by competent evidence, the burden is then upon the defendants to show that it was not through negligence that the salmon became wet, and such evidence must be sufficiently strong to overcome the presumption of negligence raised by the plaintiffs' testimony in your minds.

"Therefore, if you should find from the evidence that said salmon was delivered in good condition, and while so in defendant's possession, it became wet through other than natural atmospheric conditions or in some manner not within the defendant's control, for plaintiffs are not required to offer evidence to show how it may have become wet other than not by atmospheric conditions, and you further find plaintiffs to have been the owners of the salmon, and you further find the salmon was for such reason injured or damaged, it will be your duty to find a verdict for the plaintiffs for the amount of such damage, unless the defendant shall establish by the evidence to your satisfaction that this salmon did not become wet by reason of negligence on its part."

The court also instructed the jury as follows:

"The plaintiffs are required to prove that the defendant was negligent, and that the salmon became damaged because of the defendant's negligence, but in this regard, if the plaintiffs established by evidence satisfactory to your minds that the salmon was stored in good condition, and while so stored with the defendant and owned by plaintiffs it became wet, but not by atmospheric causes, and for that reason rusted the cans and damaged the same, this is sufficient to entitle plaintiffs to recover, unless the defendant establishes by the evidence to your satisfaction that the salmon did not become wet by its own negligence. If under such circumstances it fails to show itself without negligence, plaintiffs are entitled to recover. That is to say, when the plaintiffs have established those facts that the goods were delivered in good condition, and that it owned the goods at the

97 Or.—14

time, and that the goods while so stored with the defendant became damaged, it has made a *prima facie* case, from which it may rest its case, and if the testimony is believed by the jury, expect a verdict from the jury, unless defendant offers evidence which satisfied the jury that the damage was not due to its own negligence."

It will be observed that the court said to the jury in substance that the burden of proof is upon plaintiffs to establish the negligence of the defendant, but, upon showing that the goods were delivered in good condition and returned in bad condition, a *prima facie* case of negligence is made, and the burden is then upon the defendant to show "that it was not through its negligence that the salmon became wet"; and, indeed, the jury was told that the burden so cast upon the defendant was so great that its "evidence must be sufficiently strong to overcome the presumption of negligence." Four times the court told the jury that upon establishing this *prima facie* case the plaintiffs were entitled to a verdict, unless the defendant established by evidence to the satisfaction of the jury that it was without negligence.

7-9. The phrase "burden of proof" has two meanings: One to express the idea that a named litigant must in the end establish a given proposition in order to succeed; the other, to express the idea that at a given stage in a trial it becomes the duty of a certain one of the parties to go forward with the evidence: 3 R. C. L. 150; *Askay* v. *Maloney,* 92 Or. 566, 574 (179 Pac. 899); *Egbers* v. *Egbers,* 177 Ill. 82 (52 N. E. 285); *Valente* v. *Sierra R. Co.,* 151 Cal. 534 (91 Pac. 481); *Standard Marine Ins. Co.* v. *Traders' Compress Co.,* 46 Okl. 356 (148 Pac. 1019); *Berger* v. *St. Louis Storage & Com. Co.,* 136 Mo. App. 36 (116 S. W. 444); Thayer's Preliminary Treatise on

Evidence, 355. When the words "burden of proof" are used to express the idea that a named litigant must establish a given proposition, then it is not accurate to say that the "burden of proof" shifts at any stage of the trial: 3 R. C. L. 151; *Schumann* v. *Wager*, 36 Or. 65, 68. (58 Pac. 770); *Askay* v. *Maloney*, 92 Or. 566, 574 (179 Pac. 899); *Egbers* v. *Egbers*, 177 Ill. 82 (52 N. E. 285); *Valente* v. *Sierra R. Co.*, 151 Cal. 534 (91 Pac. 481); *Sweeney* v. *Erving*, 228 U. S. 233 (57 L. Ed. 815, Ann. Cas. 1914D, 905, 33 Sup. Ct. Rep. 416, see, also, Rose's U. S. Notes); *Levi* v. *Missouri, K. & T. Ry. Co.*, 157 Mo. App. 536 (138 S. W. 699); *Yazoo M. V. R. Co.* v. *Hughes*, 94 Miss. 242 (47 South. 662, 22 L. R. A. (N. S.) 975); *Standard Marine Ins. Co.* v. *Traders' Compress Co.*, 46 Okl. 356 (148 Pac. 1019); *Stone* v. *Case*, 34 Okl. 5 (124 Pac. 960, 43 L. R. A. (N. S.) 1168); *Berger* v. *St. Louis Storage & Com. Co.*, 136 Mo. App. 36 (116 S. W. 444); *Sims* v. *Roy*, 42 App. D. C. 496. The plaintiffs charge the defendant with negligence, and hence their right to compensation must depend upon whether the defendant was guilty of negligence. This is the proposition which the plaintiffs must in the end establish before they can succeed. The plaintiffs affirm negligence; the defendant denies negligence; and therefore the affirmative of the issue is with the plaintiffs: *James* v. *Orrell*, 68 Ark. 284 (57 S. W. 931, 82 Am. St. Rep. 293). Our Code provides:

"The party having the affirmative of the issue shall produce the evidence to prove it. Therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side": Section 810, L. O. L.

In Section 726, L. O. L., it is said that ''Each party shall prove his own affirmative allegations''; and by Section 868, subdivision 5, L. O. L., the court must on all proper occasions tell the jury that in civil cases the affirmative of the issue shall be proved. The plaintiffs must show by a preponderance of the evidence that the defendant was negligent before they can prevail, and the burden of establishing this affirmative proposition of negligence is not shifted to the defendant so as to require the latter to prove a negative by affirmatively showing by a preponderance of the evidence that it was free from negligence. It was error for the court to instruct the jury, without further explanation, that upon establishing a *prima facie* case, the plaintiff was entitled to a verdict unless the defendant offered sufficient evidence to overcome the presumption and to satisfy the jury that it was free from negligence. This instruction was equivalent to saying that the defendant must establish a negative by affirmatively showing by a preponderance of evidence a want of negligence, and that the defendant must establish such negative to the extent of overcoming the presumption of negligence, and, indeed, to the extent of satisfying the jury of its freedom from negligence: See *Sanford* v. *Kimball,* 106 Me. 355 (76 Atl. 890, 138 Am. St. Rep. 345). The most that could possibly be required of the defendant under our Code would be, to introduce enough evidence to cause the scales to balance; and yet the jurors could not but have understood from the instructions that it was incumbent upon the defendant to establish freedom from negligence, upon proof by the plaintiffs of delivery of the cans in good condition and a return of them in a damaged condition. It must, of course, be conceded that in some

jurisdictions there are precedents which impose upon the defendant the obligation of positively acquitting himself of negligence by a preponderance of evidence; but we cannot give approval to that doctrine: See *Sulpho-Saline Bath Co.* v. *Allen,* 66 Neb. 295 (92 N. W. 354, 1 Ann. Cas. 21); 6 C. J. 1160; 3 R. C. L. 152.

As ruled, however, in *Askay* v. *Maloney,* 92 Or. 566, 575 (179 Pac. 899), it is not improper to say that the "burden of proof" shifts from one party to the other, when that phrase is employed to express the idea that it is incumbent upon a named party to go forward with the evidence on a given question: 3 R. C. L. 150; 20 R. C. L. 195. The law of bailments furnishes many illustrations of the doctrine which recognizes that there may be a shifting of the "burden of proof" from one party to the other, when the phrase is used merely to mean the duty of proceeding or going forward with the evidence.

10. The better rule, and the one now enforced by practically all the modern authorities, is, stated broadly and in general terms, upon proof of delivery of chattels in good condition and proof of return in bad condition, or proof of failure to return, the law raises a presumption that the injury or failure to return was caused by the negligence of the bailee, and such proof plus the presumption, which because of necessity the law arbitrarily raises, make a *prima facie* case, which requires the bailee to go forward with evidence. This statement of the rule is, of course, made on the assumption that the bailor has done no more than to prove the naked fact of failure to return or the bare fact of injury, and that he has not attempted to account for the cause of the injury or nonreturn of the chattel. After the bailor has made a *prima facie* case, the bailee must assume the

burden of going forward, and if he does take up the burden he may relieve himself of it and shift back to the bailor the duty or burden of going forward, by depriving the bailor's case of its *prima facie* quality and making a *prima facie* case for himself. If the bailee accounts for the injury or nondelivery of the chattel, by showing that it was stolen or that it was injured or destroyed by fire or by some other cause which is consistent with the exercise of ordinary care on his part, and does not of itself point to negligence by him, then he has established for himself a *prima facie* case of due care, has deprived the bailor's case of its *prima facie* quality, and has made it necessary for the bailor again to go forward with the evidence and affirmatively show some causal negligence on the part of the bailee: *Colburn* v. *Washington State Art Assn.*, 80 Wash. 662 (141 Pac. 1153, L. R. A. 1915A, 594); *Knights* v. *Piella*, 111 Mich. 9 (69 N. W. 92, 66 Am. St. Rep. 375); *Claflin* v. *Meyer*, 75 N. Y. 260 (31 Am. Rep. 467); *Yazoo & M. V. R. Co.* v. *Hughes*, 94 Miss. 242 (47 South. 682, 22 L. R. A. (N. S.) 975); *Higman* v. *Comody*, 112 Ala. 257 (20 South. 480, 57 Am. St. Rep. 33); *Standard Marine Ins. Co.* v. *Traders' Compress Co.*, 46 Okl. 356 (148 Pac. 1019); *Holt Ice & Cold Storage Co.* v. *Arthur Jordan Co.*, 25 Ind. App. 314 (57 N. E. 575); *Schmidt* v. *Blood*, 9 Wend. (N. Y.) 268 (24 Am Dec. 143, and note); *Darby Co.* v. *Hoffberger*, 111 Md. 84 (73 Atl. 565); *Lancaster Mills* v. *Merchants Cotton-Press Co.*, 89 Tenn. 1 (14 S. W. 317, 24 Am. St. Rep. 586).

It must be remembered, of course, that the bailor may by his own pleading or evidence ascribe the injury or loss to a cause, such as fire, burglary, larceny, and the like, which is consistent with due care, and thus relieve the bailee from the presumption of neg-

ligence; or, on the other hand, the bailee, in attempting to deprive the bailor's case of its *prima facie* quality, may himself furnish evidence of causal negligence on his part: *Stone* v. *Case*, 34 Okl. 5 (124 Pac. 960, 43 L. R. A. (N. S.) 1168); *Standard Marine Ins. Co.* v. *Traders' Compress Co.*, 46 Okl. 356 (148 Pac. 1019).

11. The rule now under discussion does not apply if the possession of the bailee has not been exclusive of that of the bailor; *Bertig Bros.* v. *Norman*, 101 Ark. 75 (141 S. W. 201, Ann. Cas. 1913D, 943); *Weller & Co.* v. *Camp*, 169 Ala. 275 (52 South. 929, 28 L. R. A. (N. S.) 1106); *Boe* v. *Hodgson Graham Co.*, 103 Wash. 669 (175 Pac. 310). The defendant argues that its possession was not exclusive. It is true that two of the plaintiffs took samples from cases in March, and that David Hansen and one of his daughters saw the pile of cases occasionally when going to the dock to board a boat; but those circumstances did not place the salmon in the custody of the plaintiffs. The defendant caused the cases to be counted each week; this and other property stored in the warehouse was guarded by a watchman, both day and night; the defendant had complete dominion and control over the warehouse; and in no sense of the term were the cases of salmon in the possession of the plaintiffs. The warehouseman had exclusive possession.

12, 13. This doctrine of *prima facie* negligence does not apply unless the chattel be of such a nature that it would not deteriorate or perish from internal defects, or through the operation of natural causes; and the defendant, therefore, argues that it must be held, as a matter of law, that the rule has no application to the canned salmon involved in this liti-

gation, for the reason that unlacquered cans containing salmon will, because of atmospheric conditions, sweat and thus produce rust: *Patterson* v. *Wenatchee Canning Co.*, 53 Wash. 155 (101 Pac. 721). The answer to the argument of the defendant is that the plaintiffs produced evidence that cans containing salmon when wrapped with tissue-paper and packed and stored, as the plaintiffs' cans were, will not rust, even though they may sweat; and, furthermore, as already pointed out, there was some evidence from which the plaintiffs might argue that such cans will not even sweat. If the evidence submitted by the plaintiffs is believed, then a situation is shown which could not have been produced except by the operation of abnormal causes. The law depends upon the fact; but the jury, and not the judge, must determine the fact.

14. The amendment to the complaint did not change the cause of action. There was an additional specification of negligence; but the cause of action was not changed: *Doyle* v. *Southern Pac. Co.*, 56 Or. 495, 522 (108 Pac. 201); *Austin* v. *Simon* (Mo. App.), 204 S. W. 193.

15. The court refused to permit M. J. Canari, the warehouse foreman, to answer the following question asked by the defendant:

"What is the practice there in regard to—when a leaky condition of the roof is discovered?"

The defendant offered to prove that it was the practice to repair leaks immediately upon their discovery. There were two watchmen, one during the day and one during the night. The day watchman was over the warehouse several times daily, and the night watchman was required to make hourly inspections of the entire floor. The foreman counted the

cases each week, and in order to do so he got on top of the pile of cases. Another employee examined the cases about every two weeks. The superintendent was over the floor of the building frequently. While it is not probable, in view of other evidence received, that the ruling of the court was prejudicial to the defendant, still upon a retrial the defendant should be permitted to show the practice followed by it: *Holly* v. *Boston Gaslight Co.*, 8 Gray, 123 (69 Am. Dec. 233).

Lena Hansen testified that after she saw the leak she called the attention of Canari to it; and, when asked to state what she told him, she said:

"I told Mr. Canari the roof was leaking, and he said that he told the Oregon-Washington Railroad & Navigation Company about it, and he said they didn't pay any attention to it."

The defendant moved to strike out the answer, and the court instructed the jury as follows:

"As to that part of the testimony stating what Mr. Canari said he had told the company, will be stricken out from the testimony and not be considered by you."

The witness was then asked: "What else did Mr. Canari say?" And she answered thus:

"Mr. Canari said that it was no more than right that they should fix that, and he called their attention to it, they didn't say—he said that it would be no more than right for us to complain about it."

On cross-examination Lena Hansen stated that when she told Canari about the leak he said: "He had reported it to the Oregon-Washington Railroad & Navigation Company and they didn't pay any attention to it."

Lena Ringsted said that she heard a part of the conversation between Canari and Lena Hansen when the latter complained about the leak in the roof. This witness testified as follows:

"Miss Hansen was talking to Mr. Canari about the cans getting wet and how rusty a condition they were in, and he said, 'Well,' he says, 'Lena, I will tell you,' he said, 'as far as I tell you, the owners,'—well, he said, 'I will tell you, I will report it, but I don't know as it will do any good, because it is pretty hard in a big company like that, but' he says, 'there has been a lot of complaint about crates and furniture getting wet and' he also said, 'that if somebody would get after them good and hard, perhaps they would pay more attention to leaks in the roof.' "

The defendant objected to the answer, and the court said:

"So far as her statements of the conversation as to what he said about other property owners there making complaint should be stricken. I think the first part of it is competent. * * As to what he said in response to her complaint that the goods were wet, (is competent) but what he said as to others making complaint about it, I think is not competent."

16. The defendant earnestly insists that all the testimony about the conversation between Lena Hansen and Canari is incompetent, for the reason that Canari's statements amounted to no more than a narrative of past transactions. Stated broadly, the rule which allows admissions of an agent in an action against his principal applies only in two cases: (1) Where the agent is authorized to make an admission, as, for example, an attorney in the course of a trial; and (2) "where the admission is in the form of a declaration made by an agent, while acting within the scope of his agency, and about the business

of his principal, concerning such business." A declaration made by the agent *dum fervet opus* tends to characterize the act which the agent is doing for his principal at the time, and is admissible on the theory that the whole transaction ought to appear, including not only what was done, but also what was said. Where, however, the declaration related to a past transaction in which the agent has acted for the principal, it is a mere historical narrative, and is inadmissible, unless the agent is empowered to make the admission for his principal: *Allen v. Grande Ronde Lumber Co.*, 46 Or. 593, 595 (81 Pac. 385); *Wade v. Amalgamated Sugar Co.*, 65 Or. 488 (132 Pac. 710); *Parker v. Smith Lumber Co.*, 70 Or. 41, 50 (138 Pac. 1061); *Marks v. Columbia County Lumber Co.*, 77 Or. 22, 27 (149 Pac. 1041, Ann. Cas. 1917A, 306). The precedents last cited are illustrations of declarations which are inadmissible because in the nature of historical narratives. While a portion of the statements made by Canari are plainly incompetent, yet a part of what he said was admissible.

17. When Lena Hansen discovered the leak, the water was falling upon the salmon which was then in the warehouse. The company was being paid to care for the salmon, and it was the duty of the company to protect the cans from rain. Canari admits that Lena Hansen complained to him about a leak, and, although he denies that there was a leak, nevertheless, he admits that it was raining at the time. Lena Hansen also says that it was raining when she complained to Canari about the leak; and, moreover, she claims that it was leaking on the salmon at the very moment when she told him about the leak. She made her complaint to the proper

person, for Canari was the foreman. She complained to him in order that the leak might be repaired at once. When Lena Hansen complained about the leak, Canari was an agent of the defendant; the complaint was made to him, not only because he was an agent, but because he was the proper agent to whom to complain; the complaint was about a matter concerning which it was his duty to act, and upon which he was called to act; and what he said was said by him while acting as an agent within the scope of his agency, and about the business of his principal, concerning such business. The transaction was still depending; it had not ended; it had not become mere past history. The defendant was still bailee and its duty as such continued, for its duty had not yet terminated; and as said in *Burnside* v. *Grand Trunk Ry. Co.,* 47 N. H. 554 (93 Am. Dec. 474, 476):

"So long as the duty of the defendants to transport the goods (here to care for the goods) continued, the authority of the agent would continue, and so long his declarations in respect to it would be regarded as the declarations of the principal": *Cleveland etc. R. Co.* v. *Closser,* 126 Ind. 348 (26 N. E. 159, 22 Am. St. Rep. 593, 9 L. R. A. 754); 1 R. C. L. 509.

It was competent to show that Lena Hansen complained to Canari about the leak and that "he said that he told the Oregon-Washington Railroad & Navigation Company about it," and that "he had reported it to the" company: 1 R. C. L. 510; *Johnson* v. *McLain Investment Co.,* 79 Kan. 423 (100 Pac. 52, 131 Am. Rep. 315, and note); *North Pacific Lumber Co.* v. *Willamette Mill Co.,* 29 Or. 219, 221 (44 Pac. 286); *Patterson* v. *United Artisans,* 43 Or. 333, 336 (72 Pac. 1095); *Morse* v. *Connecticut*

*River R. R. Co.,* 6 Gray (Mass.), 450; *Kirkstall Brewery Co.* v. *Furness Ry. Co.,* 9 Q. B. 468; *Knarston* v. *Manhattan Life Ins. Co.,* 140 Cal. 57 (73 Pac. 740) ; *Sussex County Mut. Ins. Co.* v. *Woodruff,* 26 N. J. Law (2 Dutcher's Reports), 541; *Austin* v. *Chittenden,* 33 Vt. 553; *St. Louis & S. F. Ry. Co.* v. *Weaver,* 35 Kan. 412, 431 (11 Pac. 408, 57 Am. Rep. 176); *Northrup* v. *The Miss. Valley Ins. Co.,* 47 Mo. 435 (4 Am. Rep. 337); *Phillips* v. *St. Louis & San Francisco R. R. Co.,* 211 Mo. 419 (111 S. W. 109, 124 Am. St. Rep. 786, 14 Ann. Cas. 742, 17 L. R. A. (N. S.) 1167, see, also, Rose's U. S. Notes); *Levi* v. *Missouri, K. & T. Ry. Co.,* 157 Mo. App. 536 (138 S. W. 699). See, also, *Ashmore* v. *Penna Steam Towing & Trans. Co.,* 38 N. J. Law, 13. The remaining statements attributed to Canari are incompetent: *Sweetland* v. *Ill. & Miss. Tel. Co.,* 27 Iowa, 433 (1 Am. Rep. 285).

We do not deem it necessary to discuss any other assignments of error.

The judgment is reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.

McBRIDE, C. J., and BENSON and BURNETT, JJ., concur.

Denied July 27, 1920.

## ON PETITION FOR REHEARING.

(191 Pac. 655.)

*Messrs. G. C. & A. C. Fulton* and *Mr. Edw. C. Judd* for the petition.

*Mr. C. E. Cochran, Mr. A. C. Spencer* and *Mr. W. A. Robbins, contra.*

HARRIS, J.—The plaintiffs have petitioned for a rehearing, and they earnestly contend that our original opinion is erroneous. The trial court instructed the jury that upon proof of delivery of the canned salmon in good condition, plus proof of return of it in bad condition, the law presumed that the bad condition of the salmon was caused by the negligence of the defendant, and that therefore the plaintiffs were entitled to a verdict, "unless," as expressed in one instruction, "the defendant shall establish by the evidence to your satisfaction that this salmon did not become wet by reason of negligence on its part," or, as stated in another instruction, "unless defendant offers evidence which satisfies the jury that the damage was not due to its own negligence." In our original opinion we ruled that the above-quoted portions of the court's charge in effect instructed the jury that the defendant was required to show a negative by affirmatively showing by a preponderance of evidence a want of negligence, and that the defendant was obliged to establish such negative to the extent of satisfying the jury that defendant was free from negligence. We held that "the most that could

possibly be required under our Code would be to introduce enough evidence to cause the scales to balance.''

Learned counsel for the plaintiffs earnestly argue that our ruling conflicts with Section 797, L. O. L., which reads as follows:

''A presumption, unless declared by law to be conclusive, may be overcome by other evidence, direct or indirect; but unless so overcome, the jury are bound to find according to the presumption.''

It will be observed that this section does not define the meaning of the word ''overcome,'' and hence we must look elsewhere to ascertain the meaning of the term.

The argument made in behalf of the petitioners is that under the terms of Section 797, L. O. L., ''it was not sufficient for the bailee to offer evidence equal to the presumption created by law.'' The petitioners point to the fact that the word ''overcome'' is the controlling word in Section 797, L. O. L., and that the plaintiffs' evidence cannot be said to be ''overcome'' if it is equaled or balanced.

Some text-writers take the view that it is fallacious to attribute to disputable presumptions any artificial probative force after the opponent comes forward with some evidence to contradict the presumption, and that therefore, when the opposite party contradicts a presumption with some evidence, the presumption immediately disappears as a rule of law, and the case goes to the jury free from any artificial rule of law: 4 Wig. on Ev., § 2491; 17 Am. Law Review, 894. Other text-writers and courts maintain that a disputable legal presumption is in the nature of evidence and is to be weighed as such: *State* v. *Kelly,* 22 N. D.

5 (132 N. W. 223, Ann. Cas. 1913E, 974); 10 R. C. L. 870, 896; 22 C. J. 82.

In this jurisdiction the Code makes presumptions a species of evidence; for Section 793, L. O. L., declares that indirect evidence is of two kinds: Inferences and presumptions. A presumption, according to Section 795, L. O. L., is a deduction which the law expressly directs to be made from particular facts: *Doherty* v. *Hazelwood Co.*, 90 Or. 475, 481 (175 Pac. 849, 177 Pac. 432). See, also, Section 868, subd. 2, L. O. L. Instead, then, of laying the presumption out of the case the moment evidence contradicting the presumption is received, the presumption remains in the case to be considered by the jury as evidence. As already pointed out, Section 797 does not define the meaning of the term "overcome"; but other provisions of the Code make the meaning plain.

18. The Code requires that in civil cases the affirmative of the issue shall be proved, and when the evidence is contradictory the finding shall be according to the preponderance of the evidence. The plaintiffs charge the defendant with negligence; the defendant denies the charge. This is therefore the issue upon which the plaintiffs have the affirmative. The evidence is contradictory; and therefore the plaintiffs must fail, unless in the end they have sustained the affirmative by a preponderance of the evidence. If the evidence for the defendant either exceeds in weight, or equals and balances, the evidence offered by the plaintiffs, then the latter must fail, because in either event they have not proved the affirmative of the issue by a preponderance of the evidence. In other words, the evidence offered by the defendant has "overcome" the evidence offered by the plaintiffs; and when the evidence for

the defendant equals and balances the evidence for the plaintiffs, the defendant has just as effectively "overcome" the evidence for the plaintiffs as though the defendant's evidence incomparably and overwhelmingly outweighed the evidence for the plaintiffs.

As pointed out in the original opinion, in some jurisdictions the defendant is required to acquit himself of negligence by a preponderance of the evidence; but we said in the original opinion, and now repeat, that we cannot give approval to that doctrine. The plaintiffs must show as an ultimate fact, that the defendant was negligent as charged in the complaint; and it cannot be said that they have shown this alleged ultimate fact, unless the evidence preponderates in their favor, because this is the standard fixed by the legislature. The evidence cannot and does not preponderate in favor of the plaintiffs if it is evenly balanced; and therefore, if the evidence for the defendant in weight equals the evidence for the plaintiffs, then the evidence for the plaintiffs is "overcome," because the evidence for the defendant prevents the plaintiffs from succeeding and entitles the defendant to prevail. Proof of delivery in good condition and return in bad condition are the two facts which support the disputable presumption of negligence; and these two facts, plus the disputable presumption, make a *prima facie* case, and suffice for the proof of the ultimate fact of negligence, "until contradicted and overcome by other evidence": Section 695, L. O. L.

If the presumption of negligence is not contradicted at all, the jury must find for the plaintiffs. If, however, there is contradictory evidence, it becomes a question for the jury to decide whether or not, from a consideration of the whole case, the evi-

97 Or.—15

dence preponderates in favor of the plaintiffs; and in considering the whole case the disputable presumption raised by the law from given facts is to be treated and considered in the nature of evidence. A precedent in point is furnished by *Klunk* v. *The Hocking Valley Ry. Co.*, 74 Ohio St. 125 (77 N. E. 752). In that case the trial court instructed the jury that the defendant company, to overcome a presumption of negligence raised against it by the statute, "was required to satisfy you by a preponderance of the evidence that it was not negligent"; but the appellate court ruled that the defendant "need only produce such amount or degree of proof as will countervail the presumption arising therefrom. In other words, it is sufficient if the evidence offered for that purpose counterbalances the evidence by which the *prima facie* case is made out or established; it need not overbalance or outweigh it." Another apt precedent is found in *Gibbs* v. *Farmers & Merchants' State Bank*, 123 Iowa, 736 (99 N. W. 703), where the court says:

"When a *prima facie* case is made out by presumption or otherwise, in order to destroy its effect and shift the burden of producing further evidence the party denying it must produce evidence tending to negative the claim asserted to a point where, if no more testimony is given, his adversary cannot win by a preponderance of the evidence."

See, also, *Toledo etc. R. R. Co.* v. *Star Flouring Mills Co.*, 146 Fed. 953 (77 C. C. A. 203); 1 Elliott on Evidence, §§ 129, 132, 139.

19. The petitioners urge, also, that we misunderstood the effect of the question asked the witness M. J. Canari, concerning the practice in respect of repairing leaks upon discovering them. The plaintiffs insist that the form of the question was such

as to refer only to the practice at the time of the trial. Of course, if the question did not refer to the practice followed by the defendant during the period covered by the bailment, it was incompetent. However, the appellant in its printed brief discussed the question on the theory that the interrogatory related to the period covered by the bailment; and one of the questions attempted to be asked by the defendant refers to the then past, and not to the then present, for the interrogatory reads thus:

"In pursuance of that practice, what was done to repair any leaks that occurred?"

An objection to the question was sustained, and thereupon the defendant offered to show "that the witness would further testify that in pursuance of the practice that any and all leaks were immediately repaired." We adhere to the 'original opinion.

The petition for a rehearing is denied.

REVERSED AND REMANDED.     REHEARING DENIED.

McBRIDE, C. J., and BENSON and BURNETT, JJ., concur.