O'Malley, to use, *v.* Penn Athletic Club, Appellant.

Argued October 8, 1935.

Before KELLER, P. J., STADTFELD, PARKER and JAMES, JJ.

*Wm. E. Lingelbach, Jr.,* with him *Wm. Clarke Mason,* for appellant.

*Herman Steerman,* with him *Isidor Ostroff,* for appellee.

OPINION BY STADTFELD, J., November 20, 1935:

This was an action in trespass to recover damages for the loss to the plaintiff of a fur coat belonging to her, caused, according to the plaintiff's allegations, by the negligence of the defendant, the Penn Athletic Club, in the management of its cloakroom on the night of February 22, 1933.

An affidavit of defense was filed wherein the negligence of the defendant was denied. The case was tried before the court and a jury on November 19, 1934.

The Penn Athletic Club was admitted to be a corporation incorporated under the laws of the State of Pennsylvania as a social club. It occupied the building at 18th and Locust Streets, Philadelphia, on February 22, 1933, where the loss occurred.

Mr. Uhler testified that he was then the manager of the Penn Athletic Club and arranged for a party or affair to be held there by the League of the Sacred Heart, which was sponsored by Mr. Ryan, a member of the club, who was also a member of the league. Similar affairs had been held at the Penn Athletic Club by the League of the Sacred Heart on several occasions, and the arrangements on this occasion included the serving of dinner, at $1.75 per plate; the use of the cloakroom, ballroom, stage and stage dressing rooms for the show produced by the league and its members. No extra charge was made for the use of the cloakroom, and the attendants on this occasion were employees of the Penn Athletic Club who worked without pay, receiving whatever gratuities the members of the league chose to give them.

Mr. Boyle, a member of the League of the Sacred Heart, testified that he escorted Miss O'Malley to the affair at the Penn Athletic Club about 7:30 P. M., and

assisted her off with her coat and placed the coat with the attendant; saw her hang the coat on a hook on the first row at the right hand side of the counter opposite a door to the cloakroom; took receipt No. 30 for the checked coat; gave it to Miss O'Malley who placed it in her handbag, and at the end of the evening presented the check, returned to him by Miss O'Malley, to the attendant, who looked around but could not produce the coat.

Miss O'Malley verified this and said the check was in her handbag until she gave it back to Mr. Boyle in order that he might ask for the coat, and she further said they were among the last of the party to appear at the cloakroom to obtain checked clothing.

There was no mention made to the cloakroom attendants that the coat was of any particular value, and Miss Gilchrist, who checked it on hook No. 30, and gave check No. 30 to Mr. Boyle, recalled that at that time she thought it was just a fur coat, and she could not describe it. Miss O'Malley stated that she had purchased the coat three months previously from Mr. Schusterman; that it was a very good looking, long, natural Eastern Mink fur coat made to her order, which she had worn no more than five times, and which, in her opinion, was practically new and undamaged.

Mr. Schusterman testified that he had been in the fur business for twenty-six years and that in November, 1932, he sold Miss O'Malley the coat which he made of natural Eastern Mink fur to Miss O'Malley's order on her measurements. There was no evidence that Mr. Schusterman saw the coat thereafter or that he knew personally how it was worn, but he was permitted, over defendant's objection, to testify that assuming it was worn four or five times, and had not been damaged, it did not depreciate at all, and was worth $1,135

at the time it was lost; that this was its market or reproduction value.

With regard to the management of the cloakroom, and that portion of the Penn Athletic Club used by the League of the Sacred Heart that night, Mr. Sullivan, president of the league, testified that he was responsible for seeing that only league members and their guests were admitted, and for that purpose he had stationed Mr. Dorpf of the league and two officers at the main entrance, and a man at the rear, or service entrance, of the Penn Athletic Club. The cloakroom was in the basement to the right as one enters from Locust Street, and had a counter and tiers with hooks for hanging coats. The plaintiff's coat was hung on the end of the first tier to the right as one faced the cloakroom, by the side wall and opposite a door therein, which was unlocked and opened for use by the entertainers of the league, as a passage through the cloakroom to the stage dressing rooms, which, after such passage, was kept closed.

Miss Lynch and Miss Gilchrist, two of the cloakroom attendants, testified that no one except the entertainers of the league passed through this door to the cloakroom and that no one attracted their attention. The cloakroom was attended by four to six employees of the Penn Athletic Club, an adequate personnel, under the charge of Miss Lynch and Miss Gilchrist, who were always present, with Mr. Uhler, the manager, and Mr. Connor of the Penn Athletic Club also present occasionally during the course of the evening.

Miss Gilchrist, who was stationed at the end of the cloakroom, testified that she saw none of the entertainers near the rack on which plaintiff's coat was hung, and that she, as the last employee to leave the cloakroom, saw no one leave with the coat.

Mr. Uhler, Miss Lynch and Miss Gilchrist, all called by the plaintiff, testified on cross-examination, that there was nothing unusual about the operation of the cloakroom that night, and that it was run with the same degree of care and the same system as at other times and for the members of the Penn Athletic Club on other occasions.

The defendant submitted no testimony at close of plaintiff's case.

The learned trial court refused the defendant's motion for a nonsuit and also its point for binding instructions, and submitted the case to the jury on a charge, instructing them that the bailment was one for mutual benefit in which the defendant owed a duty to the plaintiff to use ordinary care in the protection of the coat, and that the burden of proving negligence in the performance of this duty rested upon the plaintiff.

The learned trial court then affirmed the plaintiff's fifth point to the effect that the failure of the defendant to deliver the coat to the plaintiff, on demand, or to satisfactorily account for its non-deliverance, is prima facie evidence of negligence, making the defendant liable for its loss.

The jury gave a verdict for the plaintiff in the sum of one thousand dollars ($1,000).

The defendant filed its motions for judgment n. o. v. and for new trial with reasons therefor, and upon their being dismissed by the court below, in an opinion by CRANE, J., appealed from the judgment entered on the verdict.

The assignments of error relate to the refusal of request for binding instructions and to enter judgment n. o. v. for defendant; the affirmance of plaintiff's fifth point, supra; the refusal to strike out the testimony of

Mr. Schusterman as to the value of the coat, and the charge of the court in relation to the same.

In view of the finding by the jury in favor of plaintiff, all the evidence and proper inferences therefrom favorable to plaintiff, must be taken as true, and all unfavorable to her rejected: Hunter v. Pope, 289 Pa. 560, 137 A. 731; Caldwell v. Continental Trust Co., 291 Pa. 35, 139 A. 586; Frank v. Reading Co., 297 Pa. 233, 146 A. 598; Snyder v. Penn Liberty Refining Co., 302 Pa. 320, 153 A. 549.

The relationship between the plaintiff and defendant corporation established a mutual benefit bailment requiring the defendant to use ordinary care with respect to the coat. "A bailment for hire, where no hire is paid, exists only where the bailment is a necessary incident of the business in which the bailee derives a profit. The bailment in such case is reciprocally beneficial to both parties and the law requires ordinary diligence on the part of the bailee and makes him responsible for ordinary neglect in his care of the bailed property": Woodruff v. Painter & Eldridge, 150 Pa. 91, 97, 24 A. 621; Scott on Bailments, page 29, Story on Bailments, Sec. 429, 440, 621, 624.

In Woodruff v. Painter & Eldridge (supra), which was an action to recover damages for the loss of a watch and chain, plaintiff entered the store of the defendants in order to purchase some clothing. For the purpose of fitting on the clothing, the plaintiff had to remove his own clothing. As he was about to lay his watch and chain on some clothing, the salesman advised him to place same in a drawer. After trying on the garments, the plaintiff returned for his watch, but it was gone. The court said (page 97): "Manifestly ...... while the customer pays nothing directly, or eo nomine, for the safekeeping of his effects, the dealer

receives his recompense in the profits of the trade of which the bailment is a necessary incident."

In the instant case, the Penn Athletic Club had entered into the contract with the expectation of making a profit. As a necessary adjunct of its business, it had agreed, in consideration of the League of the Sacred Heart guaranteeing and paying $1.75 per guest for a specified number of guests, to furnish the use of its ballroom, stage and dressing rooms, cloakrooms, banquet and all necessary attendants for the waiting service at the banquet and the attendants for the cloakroom.

The checking of any article of clothing by any member or guest of the League of the Sacred Heart, immediately created a contract of bailment between the one checking same and the Penn Athletic Club, which was mutually beneficial to both, and placed the obligation on the Penn Athletic Club, in its care of the articles of clothing checked therein, of ordinary care: Woodruff v. Painter & Eldridge, supra.

The burden of showing negligence, or the failure to exercise ordinary care is on the bailor. In the instant case, the burden is on Ruth O'Malley to show that the defendant, the Penn Athletic Club, was negligent in that it failed to exercise that degree of care which ordinary people exercise in the care of their own goods, or as aptly put by Judge Sharswood, in the case of Erie Bank v. Smith Randolph & Co., reported in 3 Brewster 9, in which case the plaintiff brought an action to recover damages for the loss of bonds bailed with the defendant, which bonds were stolen from the defendant along with the defendant's own bonds, (page 14): "What then is ordinary diligence? It has been defined —and I think, well defined—by Judge Story, 'to be that degree of care which men of common prudence

generally exercise in their affairs, in the country and the age in which they live. ...... What constitutes ordinary diligence may also be materially affected by the nature of the articles, the bulk or value of the articles claimed to be pledged. ...... The bailee, therefore, ought to proportion his care to the value of the thing that is intrusted to him, and the nature of it, upon that depends the injury or loss likely to arise to the party with whom he has dealt ......' It is undoubtedly true that, in the case of a pledge of this character, it is not enough to say that, the pawnee took the same care of the thing pledged as he did of his own goods, nor is it any answer to the demand of the pawnor, or debtor, to show that his own property, to an equal or greater amount was lost at the same time, and by the same alleged negligence. He must go further than that and satisfy the jury that there was ordinary diligence in keeping his own property."

Miss O'Malley checked her coat, through her escort, with the attendants employed by the Penn Athletic Club. The coat was given into the exclusive possession of the attendants. Its receipt was acknowledged by the giving of a receipt to the bailor on which was marked "Penn A. C.," and the number representing the hook on which the coat was placed; in the instant case, Hook No. 30. The attendant knew that the coat was a valuable one, since as was testified by Miss O'Malley, that although she did not mention to the cloakroom attendants that it was a valuable coat, nevertheless, when she called for her coat and found it missing and said, "My good coat is gone," the girl attendant said, "We admired you when you came in and we knew it was a good coat." This placed a duty upon the attendants to take greater care of the fur coat, considering its value, than in taking care of an ordinary coat.

As testified to by Miss Gilchrist, the young lady in charge of the women's checking department in the cloak-room, that "after putting the coat on hook No. 30 she did not notice the coat at all," an admission that she did not even take the trouble to see that the coat was in its proper place at any time during the entire evening.

The testimony further indicated that numerous stage performers had to pass through the cloak room in which the plaintiff's coat was kept in order to reach the entrance to the passage-way leading backstage, which entrance was opposite hook No. 30, on which the plaintiff's fur coat was placed. The cloak room attendants were fully aware of the presence of these performers in the cloak room and so testified. Miss Lynch testified that the door on the right hand side of the cloak room was open, although customarily closed. Knowing that strangers were in close proximity to the bailed articles of clothing which were in their exclusive possession and control, they should have exercised such care as commensurate with the circumstances.

The rule of law, adopted in the modern jurisdictions, with respect to loss or injury to bailed articles is that "the proof of loss or injury establishes a prima facie case against the bailee to put him upon his defense. Where chattels are delivered to a bailee in good condition and ...... are lost or not returned at all, the law presumes negligence to be the cause, and casts upon the bailee the burden of showing that the loss is due to other causes consistent with due care on his part": 6 Corpus Juris, 1158, Sec. 160, and citing in support thereof, inter alia, The Safe Deposit Co. of Pgh. v. Pollock, 85 Pa. 391; Logan v. Mathews, 6 Pa. 417; Clark v. Spence, 10 Watts, 335; Hofford v. N. Y. Central & Hudson River R. R. Co., 43 Pa. Superior Ct. 303; Hoyt

v. Clinton Hotel Co., 35 Pa. Superior Ct. 297; Koch v. National Express, 1 Lack. Leg. 289.

In 6 Corpus Juris (supra) the rule is thus stated: "...... if the possession of the bailee has not been exclusive of that of the bailor the rule does not apply. In order to throw the burden of evidence upon the bailee it is sufficient that the bailor has shown damage to the bailed article that ordinarily does not happen when the requisite degree of care is exercised ...... The burden of proof of showing negligence is on the bailor and remains on him throughout the trial. The presumption arising from the injury to the goods or failure to redeliver is sufficient to satisfy this burden and make out a prima facie case against the bailee."

For a thorough discussion of the principle involved, see Holt Ice and Cold Storage Co. v. Jordon Co., 57 N. E. 575, decided in the Appellate Court of Indiana. Also Hansen v. Oregon Washington R. & Nav. Co., 188 Pac. 963, Supreme Court of Oregon, where the rule is thus stated: "The better rule and the one now enforced by practically all the modern authorities, is, stated broadly and in general terms, upon proof of delivery of chattels in good condition, ...... and failure to return ...... the law raises a presumption that the ...... failure to return was caused by the negligence of the bailee, and such proof plus the presumption, which because of necessity the law arbitrarily raises, makes a prima facie case, which requires the bailee to go forward with the evidence."

The cases cited by appellant are readily distinguishable from the instant case.

Appellant contends that the lower court erred in affirming plaintiff's point No. 5, reading as follows: "The failure of the defendant to deliver the coat to the

plaintiff on demand, or to satisfactorily account for its non-delivery is prima facie evidence of negligence, making the defendant liable for its loss." By the Court: "When you say 'is prima facie evidence of negligence making the defendant liable for its loss,' that is not conclusive." It is claimed that the same was in contradiction of the general charge in which the court instructed the jury that the burden is on the plaintiff to establish the negligence of the defendant. We do not so consider it. The general rule was correctly stated, and the affirmance of the point quoted supra, was only a statement of the legal effect of the evidence as to the failure to deliver the coat upon demand.

Appellant contends that the court erred in refusing to strike out the testimony of Mr. Schusterman as to the value of the fur coat at the time of the loss. Before calling said witness, Miss O'Malley, the plaintiff, had testified that she had the fur coat for three months, having been made to her measurements by Mr. Schusterman, during which time she wore it on special occasions, not more than five times; that it was practically new, and that it had not sustained any damage or defect during the three months she had it.

Mr. Schusterman had been engaged in the fur business for 26 years, had personal knowledge of the coat, having manufactured it for plaintiff, and, based on his expert knowledge, as well as on the testimony of Miss O'Malley, supra, testified, in answer to the question propounded by the Court: "What was the market value of the coat as of the 22d of February, 1933?" ...... "In fact of all the matter, if I had to produce the coat ...... There would not be anything, no depreciation. It would be the value what she actually paid for it. ...... $1,135."

The Court instructed the jury "If you find the de-

fendant was negligent, under all the evidence, then give the plaintiff a verdict, but give her a verdict only for what you think was the fair market value or the cost of replacement of that garment as of the 22d of February, 1933."

We believe that Mr. Schusterman's testimony was perfectly competent. His personal experience, together with the previous testimony of plaintiff as to the condition of the coat, furnished sufficient foundation for establishing value: Uhr v. Davidyan, 76 Pa. Superior Ct. 548. Considering the entire testimony, as well as the court's instructions to the jury, it clearly appears the case was tried on the theory that the true measure of damages was the cost of replacement of the coat at the time of the loss, and this assignment of error cannot be sustained.

Under the testimony, it became a question of fact for the jury to determine whether the defendant had exercised due care under the circumstances. The case was submitted in a fair and impartial charge, and we find no error which would warrant a reversal of the judgment.

The assignments of error are overruled and judgment affirmed.